TUIKA TUIKA, Jr., ASUEGA FITIFITI, MILOVALE SOLAITA,
IOSEFA KAPELI IULI, SAO NUA,
MIKE FUIAVA, and SAVEA NUA, Plaintiffs

v.

GOVERNOR OF AMERICAN SAMOA, GOVERNMENT OF
AMERICAN SAMOA, STAR-KIST SAMOA, Inc.,
ATAMAI MARINE, Inc., PACIFIC RESOURCES
SOUTH PACIFIC, Inc., SMALL BUSINESS
ADMINISTRATION, SPECIALIZED MARINE,
SOUTHWEST MARINE OF SAMOA, and THE
KINGDOM OF TONGA, Defendants

High Court of American Samoa
Trial Division

CA No. 74-86

April 24, 1987

Before REES, Chief Justice, LUALEMAGA, Associate
Judge, and VAIVAO, Associate Judge.

Counsel: For Plaintiffs, Charles Ala'ilima
For Defendants, Donald Griesmann,
Assistant Attorney General

Seven members of the territorial House of
Representatives brought this action alleging that
the Governor of American Samoa has entered into
several leases of government land in violation of
A.S.C.A. § 37.2030. That section provides that no
such lease for a period of ten years or longer
shall be effective until it has been submitted to
the Fono. It further provides that if any such
lease is disapproved by a resolution adopted by
both houses of the Fono within thirty days of its
submission, the lease shall not take effect.

Counsel for the Governor admits that he has
not been submitting leases to the Fono. Nor, in
fact, did the previous Governor do so at any time
after March 2, 1984, when the then-Attorney General
gave his opinion that A.S.C.A. § 37.2030 violates
the American Samoa Constitution. This opinion was
based on the decision of the United States Supreme
Court in I.N.S. v. Chadha, 462 U.S. 919 (1983),
which held that a similar federal statute violated
the United States Constitution.

The government defendants have moved for
summary judgment. The motion is not based on
whether the plaintiffs (some of whom are no longer
members of the Fono) have standing as legislators,
citizens, taxpayers, or otherwise, so we do not
address that question. Nor are we called upon to
decide how, if at all, this court could obtain
jurisdiction over the Small Business Administration
and the King of Tonga. Rather, the government
defendants ask for a judgment that A.S.C.A. §
37.2030 is unconstitutional.

# I. The Constitutionality of the "Legislative Veto"

The Supreme Court in <u>Chadha</u> construed certain provisions of the United States Constitution. It did not suggest that state or territorial courts were bound to construe similar provisions in their own constitutions in the same way. It is fairly common for similarly worded constitutional and statutory provisions to be construed differently in different jurisdictions. This is true not only because reasonable people may differ about what words mean but also because the circumstances under which a law has been adopted and applied may vary widely from place to place. Nevertheless, we regard an opinion of the United States Supreme Court as highly persuasive authority whose reasoning should be given careful consideration even when it does not directly apply to a matter before us.

<u>Chadha</u> held that a "legislative veto" provision in a federal statute was unconstitutional. The law in question gave the executive branch the power to grant "hardship exemptions" to immigrants who would otherwise be deported, but provided that no such exemption would be effective if either house of Congress passed a resolution disapproving it. The Court held this provision to violate two provisions of Article I, section 7 of the United States Constitution: the "presentment clauses," under which all legislative acts must be submitted to the President for his signature or veto; and the bicameralism clause, which provides that no law can take effect without the concurrence of both houses of Congress.

Since A.S.C.A. § 37.2030 provides that <u>both</u> houses of the Fono must concur in order to disapprove a lease, this case does not give us occasion to consider whether the Court's analysis of the bicameral requirement of the United States Constitution also applies to the American Samoa Constitution.[1] Like the law struck down in <u>Chadha</u>,

---

1. Another issue raised by the immigration law considered in <u>Chadha</u>, which was important to the circuit court and also to Justice Powell but not to the Supreme Court majority, was that the legislative veto provision might constitute a legislative usurpation of the authority of the judiciary. Whether an immigrant will face hardship if

however, the lease law in this case gives the legislature the power to bring about a certain result --- the ineffectiveness of a lease--- without the approval of the executive. If bringing about such a result constitutes "lawmaking" then it violates American Samoa's presentment clause, which provides that "no law shall be enacted except by bill," and that "every bill . . . shall be presented to the Governor for his approval." Rev. Const'n of Am. Samoa art. II § 9.

The proponents of the legislative veto argue that the resolution of disapproval is not a "law." Rather, the "law" is made when the statute containing the legislative veto provision is enacted by the legislature. That law is presented to the executive, who then has a chance to sign or veto it. The resolution of disapproval is not itself a form of "lawmaking," but a subsequent condition on whose fulfilment or nonfulfilment the effects of a law will depend. It is not uncommon for laws to be enacted which delegate authority to the executive only on condition that something happen in the future. A law might delegate the President the power to impose wage and price controls if and only if the rate of inflation reaches a certain level, or to invade a country if and only if that country invades the United States. In such cases it is not the rate of inflation or the enemy generals who "make law," even though some action of theirs is necessary to trigger the result contemplated by the law. In a law with a legislative veto provision, the delegation of authority is made dependent on the condition that a resolution of disapproval not be passed.

The United States Constitution contains a powerful answer to this argument. Such quibbling

---

deported is the sort of issue that might be appealed to a court if it were not appealable to Congress. See 462 U.S. at 959-67 (Powell, J., concurring); Chadha v. I.N.S., 634 F.2d 408 (1980). Since the issues likely to arise in considering the approval or disapproval of a land lease --- having overwhelmingly to do with such things as the scarcity of land, the desirability of the proposed use, and the fairness of the price --- are not legal questions in which a court would ordinarily become involved, this issue is irrelevant to the case before us.

88

about how a legislative action should be characterized was anticipated and dealt with by the framers of the Constitution. As the Court pointed out in <u>Chadha</u>,

> Presentment to the President and the presidential veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented. During the final debate on Art I, § 7, cl 2, James Madison expressed concern that it might easily be evaded by the simple expedient of calling a proposed law a "resolution" or "vote" rather than a "bill." . . . As a consequence, Art. I, § 7, cl 3 . . . was added.

462 U.S. at 946-47. The second clause of Article I, section 7, provides only that every "Bill" passed by Congress shall be presented to the President. The third clause, inserted to meet Madison's concern, provides that every "Order, Resolution, or Vote" to which the concurrence of the House and Senate is necessary shall also be presented to him. Whether or not a resolution of disapproval constitutes "lawmaking," it is clearly an "order, resolution, or vote," and the failure to submit it to the President violates the federal constitution.

There is no corresponding provision in the American Samoa Constitution. Not only is the presentment clause of the territorial constitution limited to "bills," but the very next section contemplates something called a "joint resolution" whose passage requires a majority of the members of both Houses but not the consent of the Governor. Rev. Const'n of Am. Samoa, art. II, § 10. In light of the requirement of article I, section 9, that no law shall be made except by "bill," it seems that our Constitution contemplates some legislative activity which is not "lawmaking" but which is important enough to require a constitutional majority of the legislature. Such activity might include resolutions disapproving executive actions.

The Court in <u>Chadha</u> did not, however, place its primary reliance on the language of the presentment clauses. Rather, it took the position that the "nature" of the action of the House in reversing the decision to let Chadha stay in the country "manifests its legislative character." 462 U.S. at 994. Since in deciding to reverse the

89

executive decision Congress would no doubt be motivated by the same sorts of policy considerations that influenced it to delegate the authority in the first place, the decisions are of the same kind.

Having decided that legislative vetoes were a form of lawmaking, the Court stressed the careful attention given by the framers of the United States Constitution to devising a system of "checks and balances" that would prevent the concentration of power in any one branch of government. The Court conceded that "the 'sharing' with the Executive by Congress of its authority over aliens in this manner is, on its face, an appealing compromise." 462 U.S. at 958. It even recognized that the choice imposed on Congress if the legislative veto were unavailable --- to delegate to the executive irrevocable power to give exemptions from the immigration laws, or to delegate no power at all and consider a "private bill" for every single person requesting an exemption --- might "seem clumsy, inefficient, and unworkable." Id. at 959. Nevertheless;

> it is crystal clear from the records of the Convention, contemporaneous writings and debates, that the Framers ranked other values higher than efficiency. The records of the Convention and debates in the States preceding ratification underscore the common desire to define and limit the exercise of the newly created federal powers affecting the states and the people. There is unmistakable expression of a determination that legislation by the national Congress be a step-by-step, deliberate and deliberative process.

Id. at 958-59. The legislative veto provision therefore was held to violate the United States Constitution.

Our task is to determine whether these general policy concerns, which the Chadha Court found to underlie the presentment clauses of the federal constitution, are also dispositive in the interpretation of the somewhat different provisions of the American Samoa Constitution. This is

necessarily a speculative enterprise.[2]    In the absence of detailed legislative history, the language itself  may be the best evidence available of the concerns that motivated its enactment. There are, however, other important differences between the two documents, many of them having to do with the fact that Samoa in 1966 was not Philadelphia in 1787.

Framers of all modern constitutions have been able to benefit not only from the ideas that generated the United States Constitution but also from the results of that experiment.   Not all of these results are as the framers seem to have anticipated.   It would be fatuous to describe the role of the modern executive branch as limited to the day to day execution of policies made by the legislature.    In response to the bulk and complexity of the functions performed by the Twentieth Century state, the executive has come to exercise broad policy making authority.   Similarly, from the very beginning the classic formula by which all legislation is supposed to be general and prospective has been riddled with exceptions. Congress often passes laws to require or forbid the construction or operation of particular highways, post offices, and dams.   Indeed, the legislative veto that was struck down in <u>Chadha</u> as "inherently legislative" (because it involved policy making) might at least as easily have been struck down as "inherently executive" (since it involved an

---

[2].   It is rendered even more speculative by the fact that in 1966, when the American Samoa Constitution was adopted, the Governor was appointed by the Secretary of the Interior and had broader powers (of appointment, for instance) vis a vis the legislature than elected governors have had since 1978.   It can be argued that the test of a law's constitutionality under the separation of powers provisions of the 1966 constitution is whether those who enacted it would have wished to prohibit such a law <u>if</u> they had anticipated the institution of an elected Governor.   A better test may be to examine the understanding that prevailed in 1978 about how the 1966 Constitution was to be adapted to deal with the new constitutional arrangement. See note 5, <u>infra</u>.

attempt to _enforce_ a policy in particular cases).[3]

A modern account of the separation of powers, rather than relying on inherent characteristics of actions to be performed by the executive and the legislature, should begin by acknowledging that the branch with immediate control over most of the resources makes most of the policy. In most areas in which government has taken the field, the operating definition of executive authority is whatever has not been pretty clearly forbidden by the legislature. And the legislature, even if it is constantly in session, has time only to set the process in motion and to correct what it regards as the most egregious errors of its delegates. Defenders of the legislative veto insist, not without reason, that it is an important substitute for some of the checks and balances that did not turn out to be effective in preventing the concentration of power in the executive branch. By making it easier for the legislature to supervise the quasi-legislative activities of the executive, it reduces the likelihood that the executive will enforce policies actively opposed by those who were supposed to be the principal policy makers.

Whatever the abstract merit of this argument, _Chadha_ held that it was foreclosed for the federal

---

[3]. See the discussion of this question by Judge Kennedy in _Chadha v. I.N.S._, 634 F.2d at 431-32. The government defendants in this case do argue that the legislative veto invades inherently executive functions. They cite the United States Supreme Court's opinion in _Bowsher v. Synar_, No. 85-1377 (decided July 7, 1986), holding the Gramm-Rudman-Hollings Budget Control Act unconstitutional insofar as its enforcement was committed to an officer removable by Congress rather than by the President. The facts of _Bowsher_ are quite different from those in this case, and the Court's analysis of the general concerns underlying the separation of powers within the federal government relies heavily on the analysis in _Chadha_. We do not believe, therefore, that _Bowsher_ adds anything to the defendants' case that is not already supplied by _Chadha_. For the reasons discussed in the text, final approval or disapproval of government land leases in American Samoa is not an "inherently executive" function.

government by the clear language of the Constitution and by the specific intentions of its framers. The American Samoa framers and ratifiers, however, not only wrote and enacted a different document but did so at a time when the legislative veto had become an established part of the governmental landscape. By 1983 there were over 200 federal statutory provisions of this type in areas including but not limited to national defense, international trade, energy regulation, historic preservation, and land management. Many of these provisions had been enacted prior to 1966. Although they had occasionally been criticized, mostly by members of the executive branch, each of the six Presidents who had served between 1929 and 1966 had signed bills containing legislative veto provisions; the Justice Department under Presidents Roosevelt, Kennedy, and Johnson had specifically defended their constitutionality. See I.N.S. v. Chadha, 462 U.S. at 969 n.5 (White, J., dissenting), and sources cited therein.[4] Moreover, there is no record of any President ever having failed to honor a resolution of disapproval by Congress. In the absence of constitutional language clearly prohibiting such a device, it does not seem reasonable to attribute to a group of constitution makers in 1966 the intention of forbidding its use.

Moreover, there are differences between the federal government and that of American Samoa which suggest (contrary to the Court's analysis in Chadha of the federal system) that the legislative veto tends not toward the concentration of power within the territorial government but toward its diffusion. The Fono, which has practically no

----

4. The 1966 Constitution was "ratified and approved" by President Johnson's Secretary of the Interior after having been approved by a Constitutional Convention in American Samoa and by a majority of the voters in the 1966 territorial election. See Rev. Const'n of Am. Samoa, Preamble. If the Johnson Administration believed legislative veto provisions to be constitutional even under the highly restrictive language of the United States Constitution, it hardly seems appropriate to impute to the same Administration the intention or understanding that the American Samoa Constitution would prohibit such provisions.

staff and is in session only for a few weeks out of the year, seems far weaker in relation to American Samoa's executive branch (which in recent years has become the territory's largest employer) than Congress is in relation to the President. By the same token, prior to Chadha critics of the federal legislative veto argued that it facilitated policy making not by the whole legislature but by committees or even by committee staffs. In contrast, the individual members of a small legislature in a small place are far more likely to take an active interest in the resolutions brought before them. In matters of pressing current interest the Fono is nothing if not deliberative.

Perhaps the most important special circumstance in American Samoa, at least in the case of this particular legislative veto provision, is the special relationship that the Fono has always held to the preservation of Samoan customs and traditions, with particular regard to land. As it happens, the federal courts seem to be in the process of carving out an exception to the holding in Chadha, which would allow Congress to veto decisions of the Secretary of the Interior with regard to the disposition of public lands. See National Wildlife Federation v. Watt, 571 F. Supp. 1145, 1156-57 (D.D.C. 1983); cf. National Wildlife Federation v. Clark, 577 F. Supp. 825 (D.D.C. 1984); Pacific Legal Foundation v. Watt, 529 F. Supp. 982 (D. Mont. 1982). The distinction is based on the idea that in such cases Congress is acting in a "proprietary" rather than a strictly "legislative" capacity. The government defendants argue that these cases are irrelevant to this one, since the federal constitution specifically provides that Congress shall have the power to dispose of public lands. U.S. Const'n art. IV § 3. On the contrary, we believe the relationship of the Fono to land in American Samoa is at least as clearly established as that of Congress to public land in the United States.

Land is generally recognized, for reasons of culture and scarcity, as American Samoa's most precious commodity. Until the first elected Governor took office in 1978 the members of the Fono were the only native Samoan officials who had anything to say about its disposition, and they came to regard themselves as its peculiar guardians. This status is reflected in the third section of the Bill of Rights of the American Samoa Constitution, which makes it "the policy of the Government of American Samoa to protect persons of

Samoan ancestry against alienation of their lands and destruction of the Samoan way of life," authorizes "such legislation as may be necessary to protect the lands," and prohibits changes in laws regarding alienation of land without approval not only by the Governor but also by two-thirds of all the members of each house of two successive legislatures. Rev. Const'n of Am. Samoa, art. I § 3. The constitutional provisions for the election and qualifications of members of the Senate --- a Senator must be "a registered matai of a Samoan family who fulfills his obligations as required by Samoan custom," and is chosen "in accordance with Samoan custom" by county councils consisting of other matais --- also reflect and strengthen the traditional status of that body in ensuring "sober second thought" with regard to measures concerning land and culture.

The enactment of A.S.C.A. § 37.2030, the law providing for legislative veto of public land leases of ten years or more, was more or less simultaneous with the institution of elected governors.[5] It seems to have reflected a desire

---

[5]. It is important to recognize that the institution of the elected Governorship was itself perhaps the most important constitutional event in the history of American Samoa. It brought with it some changes that are clearly of a constitutional nature although they are contained not in the Constitution itself but in the statutes. For instance, in 1978 A.S.C.A. §§ 4.0112 was amended to provide for confirmation of department heads by the Fono. The constitutional provision which had been in effect when governors were appointed by the Secretary of the Interior, under which the Governor had apparently unrestricted power to appoint such officials, was not amended and remains part of the Constitution. See Rev. Const'n of Am. Samoa art. IV § 11. Despite the surface tension between the statute and the pre-existing constitutional provision, the arrangement made in 1978 has been respected. The constitutional provision referring to the governor's appointive power contains an exception for "officials whose appointment is otherwise provided for," but it is not at all clear that this refers to provisions in ordinary statutes. See Rev. Const'n of Am. Samoa art. IV sec. 12. Rather, the statute

that a lease of public land for a long period of time be regarded as an unusual event, of sufficient gravity to merit deliberation by the Fono as well as the participation of the Governor. This desire is consistent not only with the language of the territorial constitution but also with the spirit that informed it: the senior matai of a Samoan family is entitled to the same sort of power and respect within the family that the Governor enjoys within the territory, and yet he should not make important decisions about land without consulting the whole family.[6]

seems to have been respected because it was understood by everyone that constitutional provisions enacted prior to 1978 must be construed to acknowledge and reinforce, rather than to defeat or distort, the new constitutional arrangement made in 1978. The law being challenged in this case was adopted by the same legislature and Governor who provided for confirmation of executive appointees, as part of the same arrangement for the sharing of power under the new regime.

6. Cf. National Wildlife Federation v. Watt, supra, 571 F. Supp. at 1157:

[I]t is common historical knowledge that in the years before the Constitution was adopted (and for many years thereafter) Congress was in session for only brief periods and in recess for many months at a time. .. Public lands were matters of even greater public and political interest than they are now. It is not inconceivable that courts will decide from the text and context of Article IV, Section 3, that its Framers contemplated that Congress' proprietary power to "dispose of" public lands included the power to dispose of public land to the Executive as a trustee . . . . subject to an express and narrow condition that a specified Committee of Congress could . . . suspend that delegation.

The language of Article IV, however, contains no suggestion of an exemption from the strict provisions of the federal presentment clauses.

In light of all these circumstances, and also because the court has observed the general outcry that occurs against any measure (however harmless or salutary it might appear to the casual observer, and however attenuated its relationship to land law) that is even vaguely suspected of having a tendency to lead to the "Hawaiianization" of land in Samoa, we are unable to conclude that a representative group of Samoans who met twenty years ago intended to make it unconstitutional to require the submission of long-term public land leases to the Fono for deliberation and possible disapproval.

It is true, of course, that the same object could have been achieved simply by denying the executive the power to lease land for over ten years. An act of the legislature would thus be required whenever such a lease would be desired. If the language and history of the American Samoa Constitution were similar to those of the federal constitution, this would be the only permissible way to achieve the desired result. Since they are not, however, the legislature was free to give the Governor more authority without surrendering all authority. Under A.S.C.A. § 37.2030 the executive is free to enter into negotiations, which may be facilitated by the involvement of only a few people. Both the executive and the potential lessee understand that any contract they conclude is conditional --- but not upon the cumbersome and time-consuming process required for a change in the land laws. Rather, under A.S.C.A. § 37.2030 it is enough that the lease is sufficiently fair from the standpoint of the general community that both houses of the legislature do not rise up in arms against it.

A resolution of disapproval is not a "bill" and it is not a "law." The law is A.S.C.A. § 37.2030, wherein the Governor and the legislature

---

Moreover, the contextual circumstances cited by the court in Watt apply with far greater force in American Samoa than in the continental United States. Even if the reasoning in Chadha applied to the American Samoa Constitution, therefore, the legislative veto of land leases would seem to be within the "public lands exception" suggested by Watt.

agreed to the rules of the game with regard to disposal of public lands. These rules provide simply that the executive branch is not the only player. This arrangement does not violate the American Samoa Constitution[7].

## II. "Joint" v. "Concurrent" Resolutions

The government contends that since A.S.C.A. § 37.2030 provides that legislative disapproval of leases shall be by "concurrent resolution," and since Article II, section 9, of the American Samoa Constitution requires that "no law shall be enacted except by bill," resolutions of disapproval must be purely rhetorical exercises that are not binding on

---

[7]. If we had decided that the provision did violate the Constitution, we would then have to decide whether to strike down the whole statute or just the condition that leases be presented to the Fono for possible disapproval. This is a question of legislative intent: If the Fono and the Governor had known in 1978 that the legislative veto provision was unavailable, would they have decided to give the Governor the absolute right to lease public lands for more than ten years, or to deny him such a right altogether? Although this question depends on evidence not before us--- including the state of the law prior to 1978 and the specific evidence, if any, of legislative intent at the time the section was passed --- our initial reaction is that it is unlikely the Fono would have agreed to give the Governor absolute power. A.S.C.A. § 1.0109, providing that the unconstitutionality of one provision does not affect the validity of other provisions, is not to the contrary, for the general purpose of the lease law is to limit executive authority, and the remainder of the section can be given effect simply by omitting the legislative veto clause. It would then read simply, "No lease of real property owned or controlled by the government which extends for a period of 10 years may be effective." If, therefore, we found the legislative veto were unconstitutional, we might have to conclude that the Governor had no authority to lease land for ten years or more.

the executive. We have already rejected the assumption that in order to trigger a certain result, an activity of a legislature (or, for that matter, of an executive or a judge or a general) must constitute a "law." The law that binds the executive to honor resolutions of disapproval is A.S.C.A. § 37.2030, which was submitted as a "bill" and signed by the Governor.

A related problem is somewhat more troubling. Article II, section 10 of the Constitution refers to bills and joint resolutions, but section 2030 refers to a third entity called a concurrent resolution. "Joint resolutions" and "concurrent resolutions" are used for different purposes by different legislatures. Although we have no evidence before us on this point, we take judicial notice of the fact that the Fono ordinarily proceeds by concurrent resolution, requiring only a simple majority of the members actually voting in each house. We must also recognize the unfortunate practice of lifting whole statutes from the books of other jurisdictions with insufficient attention to whether their terminology meshes with related provisions of American Samoan law. This may be just another instance, all too familiar to students of the American Samoa Code Annotated, of the rather sloppy use of different terms in related sections. Where the terms seem to be more or less interchangeable, the courts tend to read them in relation to each other.[8]

The American Samoa Constitution clearly contemplates that the Fono may do some things without the approval of the governor, by means of a "joint resolution." Rev. Const'n of Am. Samoa, art. II § 10. Since the consent of a majority of the members of each house is required for the

---

[8]. For instance, a section of the criminal statutes entitled "Culpable mental state---Definition" provides definitions of the terms "purposely," "knowingly," and "recklessly." A.S.C.A. § 46.3202. The second degree murder statute uses the last two terms, but for no apparent reason uses "intentionally" in the place where one might expect to find "purposely." A.S.C.A. § 46.3503. Rather than declare the murder law unconstitutional or "non-binding," however, we have treated "intentionally" as the equivalent of "purposely."

passage of such resolutions (id.), the effects they may have must include some important ones; one can hardly imagine constitution makers going to the trouble of requiring a majority of the total membership of both houses in order to commend a local sports team or thank the outgoing officers for a job well done. If the Fono were to proceed on a resolution of disapproval according to the provision of article II, section 10 requiring a majority of all the members in each house for joint resolutions, the fact that the statute would seem on its face to authorize the less rigorous procedures commonly used for a concurrent resolution would not render the resolution unconstitutional or non-binding. If, on the other hand, A.S.C.A. § 37.2030 was a deliberate attempt to authorize disapproval of leases by less than the constitutional majority required for joint resolutions, or if it is so construed in practice by the Fono, then it raises a difficult question: if such an important action can be taken without observing the requirements of article II, section 10, then to what legislative actions does the constitutional requirement apply?

For the purposes of the present motion we need not decide this question. If at some time in the future the Governor submits a proposed lease to the Fono, and the Fono rejects the lease under procedures requiring less than a majority of the entire membership of each house, then the Court might have to decide whether article II, section 10, has been violated. If the Fono chooses instead to require a majority vote of the entire membership of each house --- construing article II, section 10, to apply to all resolutions which have any legal effects, as opposed to resolutions that merely express an opinion --- then the question may never come before the court.

III. Laches

Finally, the government defendants urge that the plaintiffs are barred from attacking the particular leases at issue in this case because of laches --- that is, because they waited too long to bring their claim. This contention has merit. The former Governor stopped submitting leases to the Fono in 1984, perhaps even earlier. There was nothing secretive about the Governor's action, and nothing that showed contempt for the law: he was acting on the basis of an official legal opinion of the Attorney General which had some support in a decision of the United States Supreme Court on a

100

related question. If plaintiffs had brought an action for injunctive and declaratory relief in 1984, and if they had been successful, they would have prevented the conclusion of most of the leases they now attack. They would have stopped all construction and other operations on the land affected by the remaining leases. Instead they took no action until sometime after October 1985, when one of the plaintiffs introduced a resolution in the House of Representatives that threatened to file suit if the Governor entered into any _future_ leases without submitting them to the legislature. The resolution did not pass. Its effect was to send a message to the executive branch and to lessees that it was probably all right to proceed with leases, and that in any case the leases already signed were certainly safe. Accordingly, we hold that the plaintiffs waived their right to object to any leases signed before they filed suit in June of 1986.

Conclusion

The motion to dismiss is granted insofar as it applies to plaintiffs' demands for invalidation of the particular leases signed before their suit was filed.

The motion is denied insofar as it applies to plaintiffs' demand for declaratory relief and other relief concerning leases signed after suit was filed.